# Richmond

METROPOLITAN LIFE INSURANCE COMPANY v. JOSEPH C. MYERS.

January 11, 1934.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory
and Browning, JJ.

The opinion states the case.

*Woods, Chitwood, Coxe & Rogers,* for the plaintiff in error.

*John G. Challice* and *Samuel R. Price,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

Joseph C. Myers, the plaintiff in the trial court, while in the employ of the Chevrolet Motor Company, in the city of Detroit, Mich., became insured under what is known as a group life insurance policy, issued by the Metropolitan Life Insurance Company, defendant. His work was that of assembling the heavier parts of the chassis, such as wheels and axles, for which he was paid from $45.00 to $60.00 a week. During the period of this

employment he contracted Hodgkin's disease, necessitating a discontinuance of his employment on March 31, 1929. In April, 1929, he returned to his home at Roanoke, Virginia, and claimed the benefits under the disability provision of the policy. Upon the declination of the company to pay the same this suit was instituted and prosecuted, which resulted in the judgment of the court in favor of the plaintiff for the sum of $1,470.00 with interest thereon.

The provision of the policy which was invoked is as follows: "(c) Total and Permanent Disability Benefits— Upon receipt by the company of due notice and proof— in writing—that any employee, while insured hereunder, and prior to his sixtieth birthday, has become totally and permanently disabled, as a result of bodily injury or disease, so as to be prevented thereby from engaging in any occupation and performing any work for wage or profit, the company will discontinue the life insurance in force on the life of the said employee and three months after receipt of such proof, will commence to pay, subject to the terms hereof, in lieu of the payment of life insurance at his death, monthly instalments as defined below to the said employee or to a person designated by him for the purpose; provided that if such disability is due to, or is accompanied by, mental incapacity, the instalments may be paid to the beneficiary of record of the said employee, and the company will continue such payments for the period provided below, should said employee continue totally and permanently disabled."

During the trial, at the conclusion of the plaintiff's evidence, the defendant demurred thereto, which demurrer was overruled by the court. When all of the evidence was in, the defendant again interposed its demurrer to the evidence, which was likewise overruled. Thereupon the jury was instructed to render a verdict for the plaintiff, subject to the decision of the court.

The evidence showed that upon the plaintiff's return to Roanoke he consulted Dr. Luck, a local physician, who

sent him to the Kelly Hospital in Baltimore, Md., for examination and treatment; there he received X-ray treatments for the disease from which he was suffering, and the doctor's certificate of the treatment and the effect of the disease upon the patient was admitted as evidence by stipulation and is as follows:

"This is to certify that Mr. Joe C. Myers, of Roanoke, Virginia, was given a series of X-ray treatments at the Howard A. Kelly Hospital, in Baltimore, today, November 30, 1931. Although Mr. Myers has shown some improvement under the treatment, we consider that he is permanently disabled; the disease from which he is suffering (Hodgkin's disease) is almost invariably fatal, although prolongation of life can be expected to result from the type of treatment he has received. He will return for another examination and treatment within the next sixty days. In the meantime, he is under the care of a physician in Roanoke."

Dr. Luck, of Roanoke, after testifying that the method of treating the disease was the employment of radium, was asked the following questions and gave the following responses:

"Q. Is that the accepted treatment for it?

"A. Radium is the only known thing that will sorter allay the disease. There is no known treatment that will cure the disease in medical science.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"Q. State whether or not, by reason of the disease, he became totally and permanently disabled, so as to be prevented from engaging in any occupation or work for wage or profit. Do you think he was able to perform any labor—to engage in any labor or engage in any usual occupation or labor?

"A. Any patient suffering from Hodgkin's disease, from a medical sense, is supposed to be permanently and totally disabled. Life in these cases ranges anywhere from a few months to three or four years."

The cross-examination of the witness was as follows:

"Q. Was Mr. Myers able to enter into contracts or manage a business that did not require physical labor on his part?

"A. I see no reason why Mr. Myers cannot go out in the air and ride in a car. I have advised him to get out and he gets out and takes a certain amount of light exercise and that he can drive a car—I have advised him that he can do that, and stay in the fresh air. My treatment has been carried on in co-operation with the treatment of Dr. Kelly's hospital, and I have had repeated letters from Doctors Kelly and Burnam. I did not keep them and did not know anything about this claim, but they have stated in the letters, after the treatments, that Mr. Myers should get out and get a certain amount of fresh air and exercise, but should do no manual or physical labor.

"Q. If he does do any physical work in the contracting business, it will not affect his condition, will it? The transfer business?

"A. No, sir, that is a mental condition.

"Q. That is also true of buying cattle, is it?

"A. I have advised him not to exert himself. I don't see why talking to you or me or forming contracts would have any weight on the trouble."

The evidence further shows that Myers' father was engaged in the business of buying and selling cattle. The buying was done in the vicinity of Roanoke and the selling was effected in the city of Roanoke and sometimes in places in the State of Maryland. The plaintiff engaged in this business, with his father, to the extent of visiting those who had cattle to sell, even as far away from Roanoke as thirty miles. He drove an automobile and sometimes drove a truck in delivering the cattle to purchasers in near-by places and also to the places of sale in Maryland. During a portion of the year 1929 and the year 1930 and a part of the year 1931 he deposited in bank about $37,-000.00 and during that period he withdrew the same by drawing 427 checks. The evidence also shows that when the cattle business dwindled, by reason of the business

depression, Myers established a transfer or hauling business, to which he gave a supervising attention. He owned and operated a truck in this business, employing a driver to do the work, but he sometimes drove the truck himself, but in company with his driver.

He described his activities in this way: "I tried to make a living the best way I could. All of the cattle practically belonged to my father. I had to do something to make a living, because I did not get my $50.00 a month and I had to work—I could not starve. I had to live. * * * I just simply went along with him (his father) to sit in the open air for my health, because Dr. Luck said for me to stay out in the air and the hospital people said so, too, and said to stay in the high air and the mountains. I could have laid in bed all the time, but I am not built to give up and I will live as long as I can and I will not give up, and I stay out in the air as long as I can."

His explanation of his activities in the hauling or transfer business was quite similar.

It has been said in innumerable cases decided by this court that on a demurrer to evidence, the demurrant must be considered as admitting the truth of his adversary's evidence, and all just inferences which can be drawn therefrom by a jury, and as waiving all of his own evidence which conflicts with that of his adversary, or which has been impeached, and all inferences, it would seem, from his own evidence, though not in conflict with that of his adversary, which do not necessarily result therefrom. This is so firmly fixed as the law on this subject that it is needless to cite the authorities.

In the case of *Williams* v. *Metropolitan Life Ins. Co.,* 139 Va. 341, 123 S. E. 509, it was said in terms that if a jury might have found for the demurree, the court must so find. See, also, *Citizens' Bank* v. *Taylor & Co.,* 104 Va. 164, 51 S. E. 159.

The defendant in this case then is charged with the admissions above stated and if the jury could have found for the plaintiff the court was bound to do so.

The defense insistently and earnestly presented by the defendant brings us face to face with the clear-cut legal propositions that the literal and exact terms of the policy, which embodies the terms of the agreement between the parties, must govern here; that the terms are unequivocal and unambiguous; that the court is bound by them and that a new and different contract cannot be made for the parties by judicial construction, and that, indeed, there is no reason or room here for construction, because the terms are perfectly patent and plain.

We are not unmindful of what this court has said in cases which involved the interpretation of contracts in which all of these defenses were invoked.

■ An adherence to the literal terms of the policy in this case would undoubtedly lead to the conclusion urged by the defendant. Should it be so construed? Should a construction be adopted that could fairly be said to be unreasonable? Is it not incumbent upon the courts to look for the spirit of the agreement, and, finding it, view it as a paramount consideration for its guidance?

All that has been or will be here said or suggested is to be considered in the perception of the facts and circumstances in this case.

In commenting upon what we have termed the spirit of the agreement, which is the policy, it is helpful and, we think germane, to observe that the plaintiff was insured, by a group policy, issued to his employer, when he was an assembling man, whose efforts assisted in the assembling of as many as 4,000 chassis in a single night. His compensation was in excess of $200.00 per month. This emphasizes his importance as an employee. Rather suddenly he was so stricken as to be unable to continue this work. His malady was pronounced, by those scientifically competent to say, as almost invariably fatal. His length of life was professionally fixed at from a few months to four years. To all reasonable intents and purposes would it not appear to laymen, conversant with the conditions as well as those versed in medical science, that one so

afflicted was permanently and totally disabled, so as to be prevented thereby from engaging in any occupation and performing any work for wage or profit? The compelling answer to this query would be in the affirmative.

The man was told by his physicians, who were engaged in an effort to prolong his life, that he must seek the open air and that he must have exercise in the open without attempting physical work or labor. He followed these instructions. It would hardly be questioned that one who seeks the open-air treatment and exercise under similar conditions, with no purpose or aim, except obedience to medical advice, has a difficult task. That, in the face of impending demise within a certain period, the effect of which would naturally subdue the spirit of the most courageous persons, the plaintiff was able to try to turn into profitable account some of the agencies which were employed to allay the ravages of his disease, is little short of heroism. Should this be penalized?

Many of the cases which have had to do with the effect of insurance policies, with terms similar to the ones here, have been concerned with accidents in which a hand or a leg, or some member, was lost. One of the cases cited by the appellant dealt with an accident in which the hand of a railroad employee was cut off, and the claimant was asked what he could do. His response was that he could do anything that a one-armed man could do. The appellate court denied him the recovery which he had secured in the lower court, and, we think, rightly. See *Buckner* v. *Jefferson Standard Life Ins. Co.*, 172 N. C. 762, 90 S. E. 897. Language was used in the case, relating to the construction of the terms of the policy, which was doubtless appropriate in view of the facts of that case.

In the North Carolina case this observation was made: "It is unfortunate for the plaintiff, but 'it is so nominated in the bond.'" The Shakespearean character with which this expression is associated has been held in obloquy ever since Shylock's inhuman interpretation of the "bond" was known and his unrighteous demand made.

*Lee* v. *New York Life Ins. Co.*, 188 N. C. 538, 125 S. E. 186, is another case cited by the appellant, and comfort is extracted therefrom by the approval of an instruction which appears to sustain the contention of plaintiff in error in this case, though the judgment for the plaintiff, in sustaining the verdict of the jury, was affirmed because the evidence was conflicting. In this latter North Carolina case the claimant was a farmer who developed tuberculosis, which, of course, is bad enough, but, in effect, scarcely so dreadful and terrifying as Hodgkin's disease, for the life of the tubercular patient may be indefinitely prolonged; the disease may be arrested; the scars may be healed, and the subject rendered able to do almost anything he could have done before; in fact, the white plague has been almost obliterated.

To be sure, there is a contrariety of judicial decisions in respect to the issue here. The authorities are in no wise in harmony. In our judgment, the spirit of the contract of insurance, in this case, can be described from the facts and circumstances which we have related, and it should obtain rather than the unreasonable construction to which we would be brought by a strict adherence to what is "nominated in the bond."

An interesting case, which we think is in point, is *Foglesong* v. *Modern Brotherhood* (1906), 121 Mo. App. 548, 97 S. W. 240, 241, followed on subsequent appeal in (1908) 129 Mo. App. 655, 108 S. W. 1199, which involved the construction of an insurance benefit certificate which provided for indemnity in case of permanent and total disability which rendered the insured unable to carry on or conduct any vocation or calling. The court declined to construe the provision to mean that no recovery could be had if the insured was able to carry on any vocation whatever.

It was said: "But we are unwilling to adopt such a doctrine, the effect of which would be, practically, to reduce all such contracts to nullities and to make them the instruments of extracting dues from policyholders, without

creating any liability on the part of the insurers. Common knowledge of the occupations in the lives of men and women teach us that there is scarcely any kind of disability that prevents them from following some vocation or other, except in cases of complete mental inertia. We have examples of persons without hearing, and without sight, following a vocation; some without feet, and some without hands, engaged in business. The achievements of disabled persons are seemingly marvelous. Under defendant's theory, the plaintiff might embark in the peanut trade, or follow the business of selling shoestrings or lead pencils, or follow some similar calling, in which instances, under the rule invoked, there would be no disability within the meaning of the policy. In our opinion, such was not within the contemplation of the parties. In order to carry out the intent of the parties, it is our duty to disregard the broad language used, which would have the effect to defeat the purpose of the contract and render it a nullity. It has been said 'The policy is the law by which the mutual rights and liabilities of the parties are to be measured, and should be construed strictly against the insurer, where they narrow the range and force of the allegation, or provide for forfeiture.' * * * The language of the policy, 'permanent and total disability of said member, which renders him unable to carry on or conduct any vocation or calling,' the vocation of the insured not being designated, should be construed as meaning, if anything, the vocation or calling in which he might be following at the time he became disabled, and not any vocation whatever which he might be able to follow after he had been disabled. * * * We have seen to what absurd consequences a literal construction of the language would lead."

To the same effect is *Wall* v. *Continental Casualty Co.* (1905), 111 Mo. App. 504, 86 S. W. 491.

"An injury which wholly incapacitates a manual laborer from performing any and every kind of business which he is able to do, or capable of engaging in, has

been held within the terms of a policy providing an indemnity for an injury which shall wholly disable and prevent him from the prosecution of any and every kind of business, although the injury would not prevent his doing mental work if he was fitted to do it." *Industrial Mut. Indemnity Co.* v. *Hawkins* (1910), 94 Ark. 417, 127 S. W. 457, 29 L. R. A. (N. S.) 635, 21 Ann. Cas. 1029.

In the case of *Thompson* v. *Pacific Mills,* 141 S. C. 303, 139 S. E. 619, 622, 55 A. L. R. 1241, it was said: "* * * technical defenses of this character, which rely upon adroitly drawn provisions, that are skilfully used in limitation of liability, do not commend themselves to the mind of this court."

 Under all the facts and circumstances of this case, and under the best sense of reason and law, we think the judgment of the trial court should be sustained, and we so hold.

*Affirmed.*

HOLT and EPES, JJ., dissenting.