# Staunton

## Dessie B. Carver, Adm'x, etc. v. Metropolitan Life Insurance Co.

September 6, 1950.

Record No. 3683.

Present, Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*George S. Harnsberger*, for the plaintiff in error.

*Wayt B. Timberlake, Jr.*, and *Richard W. Smith*, for the defendant in error.

GREGORY, J., delivered the opinion of the court.

Perry A. Carver, now deceased, held a policy of life insurance with the Metropolitan Life Insurance Company for $5,000. In this policy and forming a part thereof was a supplementary agreement providing that in case of total and permanent disability of the insured the company would waive the payment of premiums and pay to him certain monthly benefits or income. This policy was de-livered on September 7, 1927, and from that time until the trial of this case the premiums were paid.

This action was brought by Carver to recover the stipu-ated benefits or monthly payments which he claimed were due under the supplementary agreement. He contended that he had been totally and permanently disabled within the meaning of the disability provision and was entitled to the income payments. The insurance company denied liability.

The case was tried before a jury and at the conclusion of all of the evidence the court, upon motion of the insurance company, struck it out and this resulted in a verdict in favor of the defendant. Final judgment approving the verdict was entered on July 12, 1949, and this writ of error is being prosecuted in the name of Carver's personal representative because he departed this life about three months after the trial.

There is no controversy about the amount of the pay-ments if the administratrix is entitled to recover, and there is no question about the notice given the insurance company. The sole issue now is whether there was sufficient evidence to go to the jury on Carver's disability, in the light of the

contract and our decisions in such cases. If there was then the case should have been submitted to the jury.

The supplementary agreement embracing the disability feature of the policy is as follows: "* * * hereby agrees that upon receipt by the company at its home office in the City of New York of due proof, on forms which will be furnished by the company, on request, that the insured has, while said policy and this supplementary contract are in full force and prior to the anniversary date of said policy nearest to the sixtieth birthday of the insured, become totally and permanently disabled, as the result of bodily injury or disease occurring and originating after the issuance of said policy, so as to be prevented thereby from engaging in any occupation and performing any work for compensation or profit, and that such disability has already continued uninterruptedly for a period of at least three months, it will, during the continuance of said disability, * * *."

Carver was sixty years old at the time of the trial of this case. He was a man of limited education, and in 1914 began to work on his father's farm. Later he secured a job as a day-laborer with a firm of produce dealers—that is, dealing in poultry, turkeys, chickens and the like. In 1918 he was engaged as a "working manager" for a produce dealer. In 1932 he and his brother purchased the business of the Philadelphia Produce Company and thereafter ran it under the name of Carver Produce Company until December 31, 1945, when on account of labor troubles the business was closed and not reopened. Carver and his brother during the operation of the produce business had purchased four farms which were operated by the brother as livestock and turkey farms, the brother being the manager and director.

After the close of the produce business on December 31, 1945, Perry A. Carver helped on the farms in the raising of turkeys, his job being primarily the hauling of feed and feeding the turkeys, the food for the turkeys aggregating daily from 2,500 to 7,500 pounds. He engaged

in this work until June 19, 1947, when he was stricken with his illness.

The evidence discloses, without contradiction, that a produce business, similar to that in which Carver was engaged, is a hazardous one which involves considerable mental and physical strain.

In February, 1947, and continuing until June 19, 1947, Carver had from time to time giddy spells, vertigo, and double vision, but he did not discontinue his work on account of that disability.

On June 19, 1947, in the morning when he awakened he could not get up because of severe dizziness, vertigo and double vision. He was treated by his family physician until June 30, 1947, and then was taken in an ambulance to the University Hospital in Baltimore, Maryland. While there he developed an acute facial paralysis on the left side of his face. His chin had to be tied up so he could eat, and a patch placed over his left eye because it would not close.

After June 19, 1947, Carver did no work of any kind. When he returned from the hospital the facial paralysis partially cleared but left the left side of his face numb and stiff. This condition continued. He was placed upon a strict diet, lost considerable weight, and was thereafter weak and tired easily. He was advised by his doctors not to perform any work that would involve any mental or physical strain whatever, and he testified that he felt incapable of performing or undertaking any kind of regular work.

Dr. J. E. Wine, a physician in Harrisonburg of wide experience, testified that Carver was suffering from arteriosclerosis, this being a hardening of the blood vessels. He testified that this disease is permanent, progressive, and incurable. He also testified that Carver had had a cerebral accident (which means a stroke), and that this was a result of the arteriosclerosis. Other results were his deafness, numbness, facial paralysis, and disturbance of equilibrium.

Dr. Wine further testified that he advised Carver that if he wanted to live and not have another "accident" he would have to "curtail his activities tremendously, both physical and nervous". And finally this witness testified that he advised Carver that he "would do better and have less hazard if he would not take up any occupation".

Dr. John B. McKee, whose specialty is internal medicine practiced at Winchester, Virginia, largely corroborated the testimony of Dr. Wine. He had examined Carver on April 21, 1948. This physical examination revealed that Carver had a generalized hardening of his arteries manifested from an examination of the back of his eyes where the arteries are best seen. He also testified that he had high blood pressure and that it was his opinion that Carver had had either a thrombosis, or a clot, or a hemorrhage at the base of his brain which was due to a hardening of the arteries in his brain which was a part of the general hardening of the arteries all over his body. The physician concluded that Carver had had a stroke as a result of the high blood pressure and the hardening of the arteries. He also stated that the condition was permanent and progressive, and testified that he advised Carver to be extremely cautious in his activities. He explained the condition in this way: "If a man has hardening of the arteries and has high blood pressure and has had a stroke then of course your advice is very markedly altered. If he had never had a stroke he can be much freer in what he does. But if he has had one stroke he is then much more likely subject to a second or third stroke."

Dr. McKee's advice was that, in a condition such as Carver's—that is, high blood pressure, arteriosclerosis and a stroke,—the quieter and more calm life you lead, the more restful and complacent you are, the longer you will live. His. advice was against doing anything that would cause either physical strain or any kind of emotional upset, and that he should sleep late in the mornings, lie down for an hour or two hours in the middle of the afternoon, and that

he should not do anything that would upset him. And in response to a question as to whether he could do any work the doctor stated, "But I think the average man is healthier and lives longer if he carries out the usual activities of a normal job. But I don't think a man who has had high blood pressure and arteriosclerosis and had a stroke would live longer if he carried out an ordinary job."

The doctors who testified on behalf of the insurance company agreed with those who testified for Carver to the effect that Carver was suffering from arteriosclerosis, that he had had a stroke, facial paralysis, and that his disease was incurable and permanent, but they did say that his disability was not total. One of them said that he thought Carver could do part-time work and carry on supervisory work on a farm, do office work of various types, do part-time salesman work and many other occupational activities, but that he should not do heavy work. They said he could drive around the farm, count the turkeys, and if someone would bring in two or three buckets of grain he could throw it in and let the turkeys eat it. And finally one doctor said that Carver "could do any kind of work that he is fitted to do". Just what he meant by this statement we do not know.

The testimony of plaintiff and the doctors who appeared as witnesses in his behalf discloses that he could not work as a laborer or farm hand because of the physical effort incident thereto was dangerous. It also strongly tends to prove that he could not even haul and lift feed for the turkeys without danger to his life. And, too, he was precluded from acting as manager of a produce firm because that work brought about injurious mental strain. From this evidence, the jury might have reasonably and justifiably concluded that Carver was totally and permanently incapacitated and could perform no work for compensation or gain. And when all of the evidence for both litigants is viewed in the light most favorable to him, as it must be on

the motion to strike, it is amply sufficient to sustain a finding of total and permanent disability.

We think the court below was in error in striking out the evidence and that the case should have been submitted to the jury as there was evidence upon which the jury could have based a verdict for the plaintiff.

We have had occasion to define total and permanent disability as used in similar insurance policies and have said that it does not mean absolute incapacity, mental and physical. *Atlantic Life Ins. Co.* v. *Worley*, 161 Va. 951, 172 S. E. 168; *Metropolitan Life Ins. Co.* v. *Myers*, 161 Va. 822, 172 S. E. 279, and *Travelers Ins. Co.* v. *Brinkley*, 166 Va. 147, 184 S. E. 225. We reaffirm what we said in those cases.

In the *Brinkley Case* we did not allow a recovery because it was perfectly obvious that the insured was not totally and permanently disabled within the meaning of the policy so that he could not perform any work for compensation or profit. His injury was to the back of one hand which rendered it difficult for him to close his fingers.

We think the case at bar was one for the jury and therefore we reverse the judgment of the trial court and remand the case for a new trial.

*Reversed and remanded.*